IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| CALVIN E. CLEMINS, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:13-cv-00047 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | By: Joel C. Hoppe |
|     Defendant. | ) | United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Calvin E. Clemins brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying his claim for disability insurance benefits (DIB) and supplemental security income (SSI) under Title II of the Social Security Act (the "Act"). On appeal, Clemins argues that the Commissioner erred in failing to find that he met or equaled a listing, in assessing his residual functional capacity ("RFC"), and in failing to consider the opinion of vocational expert Benson Heckler. The Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), and this case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). After carefully reviewing the record, I find that the decision of the Administrative Law Judge ("ALJ") was based on substantial evidence and recommend that the Commissioner's decision be affirmed.

I.    Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final determination that a person is not entitled to disability benefits. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472

(4th Cir. 2012). Instead, the Court asks only whether substantial evidence supports the ALJ's

factual findings and whether the ALJ applied the correct legal standards. *Meyer v. Astrue*, 662

F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable

amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence

review takes into account the entire record, and not just the evidence cited by the ALJ. *See*

*Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v.*

*NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual

findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is

disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig*

*v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a]

factual finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a),

416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is

disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe

impairment; (3) has an impairment that meets or equals an impairment listed in the Act's

regulations; (4) can return to her past relevant work based on his or her residual functional

capacity; and if not (5) whether he or she can perform other work. *See* 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983).

The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At

step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II.   Procedural History

Clemins was born in 1964 (Administrative Record, hereinafter "R." 45), and at the time

of the ALJ's decision was considered a "younger individual" under the Act. 20 C.F.R.

§§ 404.1563(b), 416.963(b). He completed the tenth grade and is able to read and write. (R. 119,

126.) He has worked in the textile industry, as a sander for a furniture manufacturer, and most

recently as a rubber chop operator. (R. 121, 1130.) He alleges that he has been disabled since

August 29, 2006, when he left his job as a rubber chop operator. (R. 20, 120, 1141.)

Clemins filed a previous application for disability insurance benefits on September 8,

2006, which was denied initially, on reconsideration, and in an ALJ decision after hearing dated

September 9, 2009. (R. 978–88.) On February 25, 2010, the Appeals Council declined to review

the prior ALJ decision, and Clemins did not seek review in federal court.[1] (R. 989–91.)

Clemins filed new applications for SSI and DIB in April 2010. (R. 1088–1107.) These,

too, were denied both initially (R. 992–1021) and on reconsideration (R. 1022–1053). At

Clemins's request, the Commissioner convened a hearing before an ALJ on August 17, 2011.

---

[1] The ALJ was entitled to invoke administrative *res judicata* to limit consideration of Clemins's claim to the period following September 9, 2009, the date of the prior ALJ decision. § 20 C.F.R. §§ 404.957(c)(1), 416.1457(c)(1). However, although he extensively cited and discussed the September 9, 2009, ALJ decision, he did not expressly invoke that decision as precluding any claim for benefits prior to that date. Moreover, the ALJ extensively considered evidence predating the prior ALJ decision. Here, by deciding Clemins's claim that he was disabled from August 29, 2006, on its merits, the ALJ *de facto* reopened the previous proceeding and waived administrative *res judicata*. *See McGowen v. Harris*, 666 F.2d 60, 65–66 (4th Cir. 1981).

(R. 1848–1884.) Clemins was represented by counsel at the hearing, where he and a vocational expert testified. (R. 1848–1884.)

On November 2, 2011, the ALJ issued his decision finding Clemins not disabled and denying him benefits. The ALJ found that Clemins had "the following severe combination of impairments: posttraumatic stress disorder, carpal tunnel syndrome, chronic obstructive pulmonary disease, anxiety, disorders of the spine, obesity, and personality disorder." (R. 22.) The ALJ found that Clemins's other claimed impairments, including sleep apnea, chest pains, gastroesophageal reflux disease, arthritis, headaches, hepatitis C, fibromyalgia, and black-out spells, were not severe. (R. 26.) Next, the ALJ found that Clemins's severe impairments did not meet or equal any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (hereinafter "Listings"), either alone or in combination. (R. 27–29.) The ALJ then found that Clemins retained the residual functional capacity to perform a "wide range of light work," subject to several non-exertional limitations.[2] (R. 29.) Finally, the ALJ found that, although Clemins could not perform any of his past relevant work, he could nevertheless perform other jobs existing in significant numbers in the national economy, including ampoule filler, final inspector, and photo finisher. (R. 35–36.) Thus, the ALJ found him not disabled under the Act. (R. 36.) The Appeals Council denied Clemins's request for review, and this appeal followed. (R. 11–14.)

### III.  Listings

Clemins first argues that the ALJ erred in finding that his impairments did not meet or equal any of the impairments in the listings. Specifically, he faults the ALJ for failing to consider

---

[2] Specifically, the ALJ found that Clemins could only occasionally stoop, crouch, and climb ladders ropes and scaffolds; must avoid all exposure to temperature extremes, humidity, fumes, and gases; is limited to simple, routine, repetitive tasks at level 3 commonsense reasoning per the Dictionary of Occupational Titles for 2 hour periods with occasional interaction with the public and co-workers; can perform no teamwork; requires a stable, routine setting in which to interact with co-workers; and requires a sit-stand option. (R. 29.)

his Global Assessment of Functioning ("GAF") scores, which "taken in context with the copious therapy notes, medical management consults, and hospital admissions, clearly demonstrates that the Commissioner's finding that Mr. Clemins does not meet or equal Listed impairment 12.04, 12.06, or 12.06 [sic] at step three of the sequential analysis is not supported by substantial evidence." (Pl. Br. 7.) He also contends that the ALJ ignored unspecified treating source opinions showing that he met or equaled the listings. (Pl. Br. 8–9.) I will address these arguments in turn.

    *A. Mental Health Listings and GAF Scores*

        *1. Relevant Facts*

Global Assessment of Functioning scores represent a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* ("*DSM-IV*") 32 (4th ed. 2000). The scale is divided into 10 ten-point ranges reflecting different levels of functioning, with 1–10 being the lowest and 91–100 the highest. *Id.* DSM-V dropped the GAF "for several reasons, including its lack of conceptual clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013). Despite their shortcomings, GAF scores are nevertheless fairly commonly encountered in mental health treatment records. Clemins's case is no different.

Medical records relevant to Clemins's depression, anxiety, and other mental health issues begin on October 3, 2006, when Clemins began receiving treatment at Catawba Valley Behavioral Healthcare ("CVBH"). (R. 454–60.) Clemins reported feeling depressed and sad and reported that, when he was a child, his step-father physically and sexually abused him. (R. 455–56.) Sarah Coleman, a mental health counselor, diagnosed chronic post-traumatic stress disorder

(PTSD) and depressive disorder and recommended outpatient therapy. (R. 458–60, 1299–1300.) She indicated Clemins's GAF was 40 on the date of his visit and that his highest GAF score during the last year was also 40.[3] (R. 297, 391, 394, 457, 459, 1299.) Clemins, who was already taking Xanax (R. 125.), was soon started on Cymbalta, 30 mg per day. (R. 1402.)

Clemins began receiving treatment at CVBH on a regular basis, including frequent therapy sessions with Coleman. At one of these sessions in December 2006, Clemins told Coleman, "If I had a gun, I'd shoot myself in the head. I really don't feel safe alone. I might hurt myself." (R. 476.) Coleman persuaded Clemins to check himself into Catawba Valley Medical Center, where he was admitted for complaints of "post-traumatic depression." (R. 346–49, 476, 1212–15.) At the hospital, Dr. Charles Davis examined Clemins, diagnosing major depressive disorder and assigning a GAF score of 30.[4] (R. 348, 1214.) He increased Clemins's Cymablta from 30 mg to 60 mg per day[5]; switched Clemins's Xanax prescription to Valium, 5 mg twice a day, for "possible muscle spasm benefit"; and switched his Lyrica to Neurontin for affordability. (R. 348, 1214.) Clemins was discharged five days later in stable condition, denying suicidal ideation and "showing some improvement in his depression." (R. 314, 1210.)

Clemins regularly visited CVBH for mental health treatment between 2006 and 2010, including for regular therapy sessions with Coleman. (R. 453–503, 549–580, 958–74, 1290–

---

[3] A GAF score of 31–40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and failing in school)." *DSM-IV* 34.

[4] A GAF score of 21–30 indicates "behavior [that] is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). " *DSM-IV* 34.

[5] Doctors at CVBH eventually increased Clemins's daily dosage of Cymbalta to 90 mg and then 120 mg. (R. 485, 486, 1366, 1390, 1392.)

1333, 1359–1401.) Treatment notes indicate that Clemins complained of sadness and depression at almost every visit and also frequently reported anxiety and panic attacks. (R. 453–503, 549–580, 958–74, 1290–1333, 1359–1401.) At a few visits, Clemins reported suicidal ideations. (R. 476, 491–94, 972, 1373, 1398–99.) He reported visual hallucinations in March and April 2008, but treatment providers questioned whether these were really hallucinations as they occurred when Clemins was sleeping. (R. 557, 560, 572, 1320, 1322, 1381.) At Clemins's November 29, 2007, and January 9, 2009, visits, Coleman assigned a GAF score of 50, which Coleman also indicated was the highest score over the preceding year.[6] (R. 550, 966, 1296.) Clemins stopped receiving treatment at CVBH in mid-2010, when he moved to South Carolina. (R. 1698–99.)

Clemins visited Anderson-Oconee-Pickens Mental Health Center ("AOP") on September 1, 2010, for "[assessment] at the [recommendation] of [his] lawyer." (R. 1816–17.) Clemins reported "episodic fleeting [suicidal ideation] related to inability to obtain disability" and indicated that he got only four hours of sleep per night. (R. 1816.) At the clinic, Monica Perez "discussed referral options with [Clemins]" but noted that his "primary interest [was] in disability for 'physical/mental problems.'" (R. 1817.) For diagnostic impression, Perez indicated adjustment disorder and personality disorder and assigned a GAF score of 58.[7] (R. 1817.)

Clemins returned to AOP on April 12, 2011, reporting "depressed mood, panic attacks [three to four times per] day and continuing fleeting suicidal ideation since childhood."

---

[6] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* 34.

[7] A GAF score of 51–60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 34

(R. 1815.) Clemins told licensed professional counselor Cheryl Rogers that he tried to jump off a

cliff once as a child but made no other suicide attempts since. (R. 1815.) Clemins told Rogers

that he was "bipolar and schizophrenic," but Rogers noted that this was "untrue according to

previous records." (R. 1815.) Rogers diagnosed depressive disorder based on Clemins's

depressed mood and personality disorder based on "attention seeking behaviors," and she

assigned a GAF score of 62.[8] (R. 1815.)

Three days later, Clemins checked himself into AnMed Health for "suicidal ideation"

over the previous two weeks. (R. 1751.) He reported that "two weeks ago, his wife stopped him

from wanting to hang himself."[9] (R. 1752.) Dr. Abdalla Bamashmus diagnosed major depressive

disorder, depression due to general medical condition, and anxiety disorder and assigned a GAF

score of 28. (R. 1753.) After doctors prescribed Neurontin, Clemins reported "significant

response … for pain and for anxiety." (R. 1751, 1769.) Clemins also reported significant

improvement in sleep after doctors prescribed Navane and Remeron. (R. 1751.) On discharge,

Dr. Fahd Zarrouf noted a GAF score of 45 and instructed Clemins to follow up at AOP.

(R. 1751, 1771.)

Clemins visited AOP on June 1, 2011, where David Stevenson interviewed him and

completed an initial clinical assessment. (R. 1819–1822.) Clemins reported that he had struggled

with depression since he was a teenager and that his depression recently became more severe and

difficult to manage. (R. 1819.) He told Stevenson that he tried to hang himself back in March and

was admitted to AnMed Health form March 14 through March 20. (R. 1819, 1823.) Stevenson

---

[8] A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* 34.

[9] Clemins did not mention this event to Cheryl Rogers at AOP three days earlier.

diagnosed depressive disorder and PTSD and assigned a GAF score of 45. (R. 1823.) Two weeks later, Stevenson completed a discharge summary, which noted that the AOP treatment team recommended that Clemins follow up with his primary care provider. (R. 1824.) On this form, Stevenson indicated that Clemins's GAF at admission (June 1) was 50, and that his GAF at discharge (June 15) was also 50. (R. 1824.) Also in June 2011, Clemins began visiting Foothills Alliance, a non-profit sexual trauma center, for counseling relating to childhood sexual abuse. (R. 1804.)

Clemins was also examined on two separate occasions by consulting mental health examiners. On January 22, 2007, Clemens saw Dr. Anthony Carraway for a disability evaluation. (R. 406–09.) Clemins reported suffering from "post-traumatic depression" since being abused as a child. (R. 406.) He also reported that he "fight[s] anxiety in [his] chest." (R. 406.) Clemins indicated that his back pain interfered with his sleep and made his depression worse. (R. 406.) He denied psychotic symptoms, suicidal or homicidal ideation, and hallucinations, and Dr. Carraway noted "no sustained objective manic symptoms." (R. 407.) Clemins described his mood as "depressed and irritable." (R. 407.) Dr. Carraway diagnosed alcohol dependence in remission, chronic PTSD, and probable dysthymia, which he described as "early onset with an overlay of mood disorder due to chronic pain and chronic mental illness with depressive symptoms." (R. 408.) He assigned a GAF score of 62. (R. 408.)

On July 6, 2010, Clemins visited Michelle Coates, M.A., and Dr. Rebecca Reavis, Ph.D., for a psychological assessment. (R. 1677–81.) Coates asked Clemins why he couldn't work; Clemins "immediately stated, 'My back's messed up.'" (R. 1677.) Clemins told Coates that he had not worked since August 2006, when, as Coates put it, he "impulsively" quit his job at Shurtape, "after getting into an altercation with a supervisor." (R. 1678.) Clemins admitted a

history of confrontational relationships with co-workers and supervisors and also admitted to threatening staff at the Social Security Administration. (R. 1678.)

Clemins described his depressive symptoms by recounting "a chronic history of experiencing sadness" and suicidal ideations and talking about life stressors. (R. 1679.) He rated his depression as a 10 on a scale from 1 to 10. (R. 1679.) Clemins reported his mood as "real depressed" and indicated frequent crying spells over the past month. (R. 1679.) However, Coates observed that Clemins "seemed to be in a good mood." (R. 1679.) Clemins reported that his PTSD symptoms consisted of panic attacks, in which he gets "real nervous" and "his chest is tight, hurts, and feels like he has pressure on it." (R. 1679.) Clemins indicated that these attacks can last up to three to four hours. (R. 1679.)

Based on her examination, Coates diagnosed depressive disorder and borderline personality disorder. (R. 1680.) Coates indicated that she believed Clemins "very easily meets the criteria for diagnosis of borderline personality disorder, which I believe to be his primary mental health issue." (R. 1681.) Commenting on the contrast between Clemins's presentation and his report of symptoms, she wrote that Clemins was "by no means as depressed as [he] seems to think that he is." (R. 1681.) She rejected PTSD because Clemins's description of three-hour-long panic attacks is "by definition … significantly longer than what panic attacks are supposed to last." (R. 1681.)

In his decision, the ALJ summarized Clemins's mental health treatment history. The ALJ noted Clemins's December 2006 and April 2011 hospitalizations for suicidal ideation (R. 23, 25.) The ALJ also summarized Clemins's treatment at Catawba Valley Behavioral Health, noting that Clemins

> presented initially in 2006 with sadness and symptoms of PTSD, such as
> flashbacks and nightmares. Notes from 2007 report depression, anxiety, and panic

attacks, and some issues with grief over the death of a parent. Notes from 2008 and 2009 report continued depressive and anxious complaints with low motivation and some social isolation. Similar complaints persisted into 2010, though treatment notes from February 2010 report [Clemins's] "anxiety and depression continued to be manageable."

(R. 23.) The ALJ also noted that Clemins received mental health treatment from licensed professional counselor Susan Salley in 2011, at Honea Path Free Clinic in 2010 and 2011, and at AOP Mental Health Center in 2010 and 2011. (R. 25.) Based on these records, the ALJ found that Clemins had severe impairments of PTSD, anxiety, depression, and borderline personality disorder. (R. 25.)

Although the ALJ found Clemins had several severe mental impairments, he found that none of these impairments met or equaled the Listings. (R. 27.) Specifically, the ALJ found that Clemins failed to satisfy the paragraph B criteria of sections 12.04, 12.06, and 12.08 of the Listings because Clemins did not have marked limitations in two of three areas of functioning (activities of daily living; social functioning; and maintaining concentration, persistence, and pace), or marked limitation in one area of functioning and repeated episodes of decompensation, each of extended duration. (R. 27.) Rather, the ALJ found that Clemins had mild restriction in activities in daily living and moderate difficulties in social functioning and maintaining concentration, persistence, and pace. (R. 28.) The ALJ also found that Clemins had no episodes of decompensation of extended duration because neither of his psychiatric hospitalizations lasted more than a week. (R. 29.)

In reaching these conclusions, the ALJ cited medical source opinions, evidence from medical records, and Clemins's own statements. (R. 28.) The ALJ considered not only evidence supporting his conclusion, but evidence that arguably supported more extensive limitations. (R. 28.) For example, the ALJ explained his conclusion that Clemins had only "mild" restriction in activities of daily living as follows:

In activities of daily living, the claimant has mild restriction. Mental health treatment notes reveal depressed mood with significant isolation and limited daily activities (Exhibits B7F and B9F). However, in a Function Report from May 2010, claimant reported he cared for a dog, prepared simple meals, did laundry, drove, could go out alone, and shopped (Exhibit B6E), and claimant reported to Ms. Coates in July 2010 that he shopped, drove, and cared for personal needs independently (Exhibit B11F/2). Furthermore, Dr. Fulmer and Dr. Williams assessed no restriction at all in activities of daily living (Exhibits B4A and B10A).

(R. 28.)

The ALJ also "considered whether" Clemins met the paragraph C criteria for Listings 12.04 and 12.06, but concluded that "the evidence fails to establish the presence of the 'paragraph C' criteria" without offering further discussion.

### 2. Discussion

The third step of the Commissioner's decisional process for evaluating disability claims requires ALJs to consider claimant's impairments against the impairments in the Listings. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (emphasis in original); 20 C.F.R. §§ 404.1525(a), 416.925(a). They "streamline[] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). The claimant bears the burden of demonstrating that her impairment meets or equals a medical listing, *id.* at 146 n. 5, and, given that the listings are designed to address only the most severe cases, the burden is not an easy one to satisfy. A claimant who meets or equals a listing is "conclusively presumed to be disabled." *Id.* at 141.

An impairment "meets" a listed impairment if the it "satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the [one-year] duration

requirement." 20 C.F.R. § 404.1525(c)(3), 416.925(c)(3). An impairment or combination of impairments "is medically equivalent to a listed impairment … if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). In determining whether a claimant's medical impairments are of listing-level severity, an ALJ must "consider the combined effects of [the] claimant's impairments." *Davis v. Shalala*, 985 F.2d 528, 533 (11th Cir. 1993); *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990); *see also* 42 U.S.C. § 423(d)(2)(B) (requiring the Commissioner to consider "the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

Sections 12.00 through 12.10 of the Listings address mental health disorders. "Each [mental disorder] listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings) and paragraph B criteria (a set of impairment-related functional limitations)." Listings § 12.00(A). Listings 12.02, 12.03, 12.04, and 12.06 also contain a paragraph C, which set forth additional functional criteria. *Id.* To establish the presence of a listed impairment, the claimant must satisfy the criteria of both paragraphs A and B, or, when appropriate, both paragraphs A and C, of the particular listed impairment. *Id.*

The ALJ in this case considered listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.08 (personality disorders). To meet paragraph B of any of these listings, a claimant must show that his or her mental impairments cause "marked"[10] limitations in

_____

[10] The listings define "marked" as more than moderate, but less than extreme. Listings § 12.00(C). The regulations do not define either "moderate" or "extreme." *See also* 20 C.F.R. § 404.1520a ("When we rate the degree of limitation in the first three functional areas, we will use the following five point scale: None, mild, moderate, marked, and extreme."). The Listings

two of three areas of functioning (activities of daily living; social functioning; and maintaining concentration, persistence, and pace), or marked limitation in one area of functioning and repeated episodes of decompensation, each of extended duration.[11] Listings §§ 12.04(B), 12.06(B), 12.08(B).

A claimant may establish disability under listings 12.04 and 12.06 by showing that the paragraph A and paragraph C criteria are satisfied, even though the claimant may fail to meet the criteria in paragraphs B. Paragraph C of listing 12.04 requires a "medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support." In addition, the claimant must show repeated, extended episodes of decompensation; "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate"; or "inability to function outside of a highly supportive living arrangement" that has lasted at least a year, "with an indication of continued need for such an arrangement." Paragraph C of listing 12.06 requires "complete inability to function independently outside the area of one's home."

Ellis argues that the ALJ's listing analysis is deficient because the ALJ did not consider his GAF scores, and that these scores "clearly demonstrate[]" that he meets or equals listing 12.04, 12.06, or 12.08. (Pl. Br. 7.)

---

explain that "[a] marked limitation may arise when … the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis. Listings § 12.00(C).
[11] To satisfy the criteria for episodes of decompensation, a claimant must show at least three episodes within one year, each lasting at least two weeks. *Id.* § 12.00(C)(4).

Because they "reflect judgments about the nature and severity of [a claimant's] impairment(s)…, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions," GAF scores assigned by "medically acceptable sources" constitute "medical opinions" under the regulations. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An ALJ must consider and evaluate all such opinions in the case record. 20 C.F.R. §§ 404.1527, 416.927. In determining what weight to afford a doctor's opinion, the ALJ must consider all relevant factors, including the relationship between the doctor and the patient, the degree to which the opinion is supported or contradicted by other evidence in the record, and whether the doctor's opinion pertains to his area of specialty. 20 C.F.R. §§ 404.1527(c), 416.927(c).

Opinions from physicians and other medically acceptable sources who have treated the patient are generally afforded more weight, because treating sources are "most able to provide a detailed longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ must give a treating source opinion "controlling weight" to the extent that the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527, 416.927. Even when a treating source opinion is less than "well-supported" by diagnostic techniques, it is still entitled to a measure of deference. *Tucker v. Astrue*, 897 F. Supp. 2d 448, 465 (S.D. W. Va. 2012) (citing Social Security Ruling 96-2p). However, an ALJ may reject a treating physician's opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Mastro*, 270 F.3d at 178; *Tucker*, 897 F. Supp. 2d at 465. When an ALJ gives less than controlling weight to a treating physician's opinion, the

treating source rule requires him to specify how much weight he gives the opinion and offer "good reasons" for that decision. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

A GAF score assigned by a health care professional who is not an "acceptable medical source" may still warrant consideration as an opinion from an "[other] medical source." 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) (noting that the agency "may also use evidence from other sources" including "nurse-practitioners, physician's assistants, naturopaths, chiropractors, audiologists, and therapists," in evaluating disability); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939. Opinions from other medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, at *3. The same factors used to evaluate medical opinions identified in § 404.1527(c) and § 416.927(c)—scope of the relationship with the patient, consistency, support, quality of explanation, specialty, and other relevant factors—may be applied to opinion evidence from other medical sources, although not every factor will be relevant in every case. *Id.* at *4–5. An ALJ must consider relevant evidence from other medical sources. *Woods v. Commissioner*, No. 6:12-cv-0014, 2013 WL 4678381, at *6 (W.D. Va. Aug. 30, 2013). Furthermore, an ALJ "generally should explain the weight given to opinions from [other medical sources], or otherwise ensure that the discussion of the evidence … allows [a reviewing court] to follow the adjudicator's reasoning, when such opinions may have an effect on the case." SSR 06-03p, at *6; *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (holding that ALJ's consideration of medical evidence was "more than adequate," even though ALJ failed to discuss physical therapist's report).

Nevertheless, even when assigned by a treating physician, a GAF score may be of limited evidentiary value in determining whether a claimant is disabled. A GAF score "has no direct

medical or legal correlation to the severity requirements of social security regulations." *Powell v. Astrue*, 927 F. Supp. 2d 267, 273 (W.D.N.C. 2013) (citing *Oliver v. Commissioner*, 415 Fed. Appx. 681, 684 (6th Cir. 2011)); *see Pinegar v. Commissioner*, 499 Fed. Appx. 666, 667 (9th Cir. 2012) ("Regarding Pinegar's Global Assessment of Functioning scores, the Commissioner has stated that such scores do not directly correlate with the requirements of Listing 12.04 for a finding of disability, and this Court has not found error when an ALJ does not consider them."); *see also Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50746, 50764–65. For example, A GAF score between 41 and 50 indicates only that the patient suffers "serious symptoms," such as "suicidal ideation, severe obsessional rituals, [or] frequent shoplifting[,] OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job, cannot work)." *DSM-IV* 34. Thus, while inability to keep a job may be sufficient to warrant a GAF score in this range or lower, a GAF score of 41–50 does not necessarily reflect the scorer's opinion that the patient is unable to maintain substantial gainful employment because of the patient's impairments. *See id.* 32–33 ("It should be noted that in situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two."). Moreover, a GAF score merely reflects a "'snapshot of functioning at any given moment,'" *Powell*, 927 F. Supp. 2d at 273 (quoting *Fowler v. Astrue*, No. 1:10-cv-123, 2011 WL 5974279, at *3 (W.D.N.C. Nov. 29, 2011)), and may not be "indicative of [a claimant's] long term level of functioning," *Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009). Accordingly, "[t]he failure to reference a GAF score is not, standing alone, sufficient grounds to reverse a disability determination." *Paris v. Colvin*, No. 7:12-cv-00596, 2014 WL 534057, at *6 (W.D. Va. Feb. 10, 2014) (quoting *Love v. Astrue*, 3:11cv14-FDW-DSC, 2011 WL 4899989, at *5 (W.D.N.C. Sept.

6, 2011)) (internal quotations, citations, and alterations omitted). "This is particularly true where the ALJ fully evaluated the records and treatment notes upon which the GAF scores were based." *Id.* (citing *Love*, 2011 WL 4899989, at \*5).

Here, the ALJ thoroughly evaluated Clemins's mental health records and explained how the evidence in those records factored into his decision. For the most part, the ALJ explained his listing findings in detail, noting evidence that supported Clemins's claim as well as evidence that did not. (R. 28.) For example, in explaining his finding that Clemins had moderate difficulties in social functioning, the ALJ noted medical records indicating "some social isolation" and "difficulty being around people," as well as records that showed that Clemins was pleasant and cooperative during examinations and frequently attended church. (*Id.*) While the ALJ could have explained his paragraph C findings in more detail, this does not require reversal because there is no evidence that Clemins actually satisfies the paragraph C criteria for either listing 12.04 or listing 12.06.

Although Clemins asserts that his GAF scores require a finding that he meets or equals a listing, he makes no attempt to explain how his condition actually does meet or equal a listing or how his GAF scores tend to demonstrate this fact. Nor does he dispute any particular finding in the ALJ's listing analysis. As such, I see no reason to upset the ALJ's thorough and evenhanded listings analysis.

### B. Other Treating Source Opinions

Clemins next contends that the "record is replete with the diagnoses of and treatment by [Clemins's] health care providers who ultimately provided letters indicating that [Clemins] is disabled" and that the ALJ erred when he failed to "give the treating sources controlling weight in determining whether [Clemins] meets or equals a listed impairment." (Pl. Br. 8–9.) Clemins does not identify these opinions beyond noting that "[t]he record includes their assessment of

[his] level of functioning throughout the relevant time period as identified through GAF scores which the ALJ ignored." (Pl. Br. 9.) As explained above, Clemins's GAF scores provide scant evidentiary basis to support a finding that he meets or equals a listing. In the facts section of his brief, Clemins cites other treating source opinions—specifically, those of Dr. Benitez (R. 748), Dr. Mathis (R. 810, 834), and Dr. Walker (R. 1825–26)—but none of these opinions support a finding that he meets or equals a listing.

Dr. Benitez's letter, dated May 10, 2007, states only that Clemins "has a history significant for post-traumatic stress disorder, low back pain secondary to a bulging disc involving L5-S1, as well as chest pain syndrome," that "[h]is stress thallium is basically unremarkable without any evidence of ischemia," and that "[b]ecause of his current medical conditions, he is unable to work at this point." (R. 748.) Dr. Mathis penned a letter on May 18, 2007, stating his belief that Clemins "is unable to work at any job that requires significant bending, lifting, or sitting" due "primarily" to "his severe chronic obstructive pulmonary disease and degenerative disc disease with back pain." (R. 810.) Dr. Mathis also indicated that he believed "the duration of his disability [to be] indefinite." (*Id.*) Additionally, in treatment notes for a visit on May 22, 2007, Dr. Mathis wrote: "permanent disability due to degenerative disc disease [and] severe [chronic obstructive pulmonary disease], probable obstructive sleep apnea, anxiety/depression." (R. 834.)

Dr. Walker's letter, dated July 26, 2011, noted that Clemins suffers from "obstructive sleep apnea," "severe arthritis," "scoliosis," and "lumbar disc," and has "a history of anxiety/depression." (R. 1825.) Dr. Walker opines that Clemins has "severe COPD, obstructive sleep apnea, severe arthritis, anxiety depression," and states that "[i]t is my feeling that he is not able to do any job that requires significant bending, lifting or sitting," or "significant mental

concentration and acuity." (R. 1826.) For these reasons, Dr. Walker believes that Clemins "is disabled and permanently disabled." (*Id.*)

The ALJ did not address either Dr. Benitez or Dr. Mathis's opinions; in fact, it appears from the record that he did not have them before him at all.[12] The previous ALJ did not consider Dr. Benitez's opinion and considered Dr. Mathis's opinions, but afforded them little weight. The ALJ did consider Dr. Walker's opinions but gave them "little weight because," among other reasons, they "were based on only one examination and are inconsistent with the weight of the evidence." (R. 33.)

The ALJ's failure to consider the opinions of Dr. Benitez and Dr. Mathis in evaluating Clemins's disorders against the listings was harmless, because nothing in the statements of either doctor supports a finding that Clemins's impairments met or equaled a listing. For the same reason, the ALJ did not err in failing to find that Clemins met or equaled a listing based on Dr.

---

[12] More generally, it appears from the record that the ALJ did not consider any of the exhibits that were before the previous ALJ. At the hearing, the ALJ admitted into evidence only exhibits B1A through B25F. (R. 1852.) Although the ALJ extensively cites exhibits numbered B1A through B25F, he does not once cite an exhibit numbered 1A through 37F in the record. On some occasions, the ALJ indirectly refers to evidence in these exhibits by citing the prior ALJ decision, which is exhibit B1A. For example, on page 30 of the record, the ALJ writes: "Judge Talbot indicated nerve conduction studies in November 2006 demonstrated bilateral carpal tunnel syndrome (Exhibit B1A/6)...." (R. 30.) In addition, while discussing the opinion of Dr. Walker, the ALJ remarked that it was based on 2007 pulmonary function testing that was "not in evidence." (R. 33.) Although this report is not contained in Exhibits B1A through B25F, it is on page 55 of Exhibit 25F. (R. 714.)

The parties' briefs do not explain this anomaly. More pertinently, Clemins did not assign as error the ALJ's apparent failure to consider all of these exhibits themselves. Many of the records from the first set of exhibits are duplicated in the second set of exhibits, and Clemins has not shown any prejudice from the ALJ's failure to consider any medical opinions or treatment notes found only in the first set of exhibits. Furthermore, Clemins has already had a fair hearing and decision on these records. Although the current ALJ *de facto* re-opened the earlier denial, he did take into account the prior ALJ's decision and in fact gave it significant weight on many points. (*See* R. 34.) Under these circumstances, I will not recommend remand on a basis that Clemins did not raise.

Walker's letter. Although Clemins does not say exactly which listing he thinks he meets or equals, the ALJ considered Listings 1.04 (disorders of the spine), 3.02 (chronic pulmonary insufficiency), and 11.14 (peripheral neuropathies), as well as the three listings relating to Clemins's mental impairments. (R. 27.) The ALJ found that Clemins did not meet Listing 1.04 because his most recent MRI demonstrated no nerve root involvement and because he failed to show motor loss as required by paragraph A or inability to ambulate effectively as required by paragraph C. (R. 27.) Clemins did not meet Listing 3.02 because his pulmonary tests exceeded the level required to meet that listing. (R. 27.) Finally, the ALJ determined that Clemins did not meet Listing 11.14 because his physical examinations did not show "persistent disorganization of motor function" as required by that listing. (R. 27.) Nothing in Dr. Benitez, Dr. Mathis, or Dr. Walker's opinions could possibly alter any of these findings.[13] Accordingly, I find that the ALJ's determination that Clemins did not meet any of the Listings is supported by substantial evidence.

## IV. RFC Assessment

Clemins argues that the ALJ erred in assessing his RFC for two reasons. First, he argues that the ALJ erred in "outright ignor[ing]" his GAF scores "in reaching his decision regarding RFC." (Pl. Br. 7.) Second, he accuses the ALJ of misapplying both steps of the pain standard. (Pl. Br. 8–10.)

---

[13] Clemins does not argue that the ALJ erred in failing to consider the opinions of Dr. Benitez or Dr. Mathis in assessing his residual functional capacity.

*A. GAF Scores*

In assessing Clemins's RFC, the ALJ "limited [Clemins] to performing simple tasks with substantially limited interpersonal interaction in a stable setting" because of Clemins's mental disorders. (R. 31.)[14] The ALJ explained this finding as follows:

> Records from Catawba Valley Behavioral Health reveal continued depressive complaints with euthymic and dysphoric mood observed on numerous examinations, as well as some anxious moods and social isolation (Exhibits B7F and B9F). In addition, Ms. Coates and Dr. Reavis assessed a personality disorder with some difficulties being around others (Exhibit B11F), the record reveals two psychiatric hospitalizations for suicidal ideations (Exhibits B1F and B20F), confusion was observed during a Field Office teleclaim in May 2010 (Exhibit B2E), Ms. Salley reported flashbacks and difficulty being around people (Exhibit B2IF), and examination in June 2011 revealed distractibility and poor memory (Exhibit B23F/9). However, in a Function Report from May 2010, claimant reported he cared for a dog, prepared simple meals, did laundry, drove, could go out alone, and shopped (Exhibit B6E), claimant reported to Ms. Coates in July 2010 that he shopped, drove, and cared for personal needs independently (Exhibit B11F/2), examination in October 2006 demonstrated unremarkable interpersonal ability (Exhibit B7F/15), and Ms. Coates observed claimant demonstrated "good" mood and normal affect, was energetic, was "very friendly, polite, pleasant, and likable," "followed simple written and verbal instructions well with no apparent comprehension problems," and "interact[ed] and engage[ed] well" (Exhibit B11F). In addition, claimant reported he attended church in February 2010 (Exhibit B9F/5), numerous examinations showed appropriate affect (Exhibit B9F; Exhibit B11F/3; Exhibit B5F/15), claimant was described as pleasant and cooperative during examinations (Exhibit B11F/1; Exhibit B5F/4 and 6; Exhibit B9F; Exhibit B12F/2), treatment notes report no side effects from medication (Exhibit B9F), no problems concentrating were observed during Field Office teleclaim (Exhibit B2E), Mr. Nelson reported claimant could pay attention well (Exhibit B7E), examination in October 2006 revealed no memory impairment and "average" thinking (Exhibit B7F/15), examinations in 2007 and 2008 demonstrated intact cognitive function (Exhibit B9F/18-32), examinations demonstrated normal thought processes (Exhibit B9F; Exhibit B11F/3), and examination in April 2011 showed intact memory and good attention and concentration following treatment for suicidal ideations (Exhibit B20F/22).

---

[14] In particular, the ALJ found that Clemins "can concentrate, persist, and work at pace to do simple, routine, repetitive tasks at level 3 commonsense reasoning per the Dictionary of Occupational Titles for 2 hour periods with occasional interaction with the public and co-workers. He can perform no teamwork, and appropriately interact with supervisors in a stable, routine setting." (R. 29.)

Despite claimant's allegations of highly limiting depression and anxiety, claimant reported "the meds [were] working good" in November 2007 (Exhibit B9F/27), claimant stated his medicines were "working fine" in January 2008 (Exhibit B9F/25), claimant stated he was "doing pretty good" in August 2008 (Exhibit B9F/19), claimant reported his mood had "been on a fairly even keel" in November 2008 (Exhibit B9F/16), notes from March 2009 report things were "going well" in terms of claimant's mood though there was some anxiety (Exhibit B9F/13), notes from September 2009 report improvement with increased Cymbalta dosage (Exhibit B9F/7), records from February 2010 report claimant's "anxiety and depression continue to be manageable" (Exhibit B9F/5), and notes from March 2010 report claimant was "doing reasonably well in terms of his mood and anxiety" (Exhibit B9F/3).

(R. 31–32.)

Addressing opinion evidence regarding Clemins's functional limitations, the ALJ gave some weight to the opinions of Coates and Dr. Reavis. (R. 33.) The ALJ noted that although their findings were consistent with their examination, notes from treating sources indicated that Clemins's mood and affect were usually worse during the relevant period. (R. 33.) The ALJ also gave some weight to the state agency records examiners' opinions based on the support and explanations they provided for these opinions and their experience in applying social security disability law; however, the ALJ limited Clemins to simple tasks due to Clemins's "rather consistent depressive symptoms." (R. 33.) The ALJ rejected Dr. Walker's opinion that Clemins could not do work involving significant concentration because it was inconsistent with other evidence in the record, including Coates's report, medical records, and a third-party function report completed by Marshall Nelson, Clemins's neighbor. (R. 34.)

The ALJ also considered the previous ALJ's decision pursuant to Acquiescence Ruling ("AR") 00-1(4), 65 Fed. Reg. 1936 (2000),[15] giving that decision "significant weight" because it

---

[15] An acquiescence ruling explains how the agency "will apply a holding in a decision of a United States Court of Appeals that [the agency] determine[s] conflicts with [its] interpretation of a provision of the Social Security Act or regulations." AR 00-1(4), 65 Fed. Reg. at 1936. In AR 00-1(4), the agency acquiesced in and interpreted the Fourth Circuit's decision in *Albright v.*

"was thoroughly supported and explained based on an extensive review of [Clemins's records]."
(R. 34.)[16] The ALJ noted that, although two years had passed since this decision, "recent medical records reveal [that Clemins's] conditions have remained rather constant." (R. 34.) Specifically, the ALJ "note[d] that Clemins experienced some suicidal ideations in April 2011 that warranted hospitalization; however, Clemins had a Global Asessment of Functioning score of 62 after several days of treatment, indicating only mild mental symptoms or difficulties in functioning." (R. 35.) The treatment notes the ALJ cites for this GAF score are from Clemins's April 12, 2011, visit to AOP; that visit actually predates Clemins's hospitalization. (R. 1815.)

Aside from the GAF score assigned by Rogers at AOP, the ALJ did not specifically cite any of the other GAF scores. The ALJ does not appear to have considered Dr. Carraway's report at all, but this report is unfavorable to Clemins and would not have helped him.

As noted above, an ALJ's failure to cite GAF scores is not, standing alone, sufficient grounds to reverse a disability determination," especially "where the ALJ fully evaluated the records and treatment notes upon which the GAF scores were based." *Paris*, 2014 WL 534057, at *6 (quoting *Love v. Astrue*, 3:11cv14-FDW-DSC, 2011 WL 4899989, at *5 (W.D.N.C. Sept. 6, 2011)) (internal quotations, citations, and alterations omitted). "Thus, while GAF scores are relevant and should be considered, they are 'not essential to the accuracy of an RFC

_____

*Commissioner*, 174 F.3d 473 (4th Cir. 1999). That ruling explains that an adjudicator considering a subsequent disability claim must "consider the prior [decision] as evidence and give it appropriate weight in light of all relevant facts and circumstances." *Id.* at 1938. Relevant factors include whether the prior decision was based on facts likely to change over time; the likelihood that material facts would change, given the period of time between the prior decision and subsequent claim; and the extent that new evidence provides a basis for a different finding with respect to the period being adjudicated in the subsequent claim. *Id.*

[16] The prior ALJ decision also limited Clemins to "unskilled work requiring the performance of simple, routine repetitive tasks with only occasional contact with the public and co-workers and not involving teamwork." (R. 983.)

determination.'" *Figgins v. Colvin*, No. C13-3022-MWB, 2014 WL 28648, at *16 (N.D. Iowa Jan. 2, 2014) (citing *Earnheart v. Astrue*, 484 Fed. Appx. 73, 75 (8th Cir. 2012)).

And, as noted above, the ALJ thoroughly evaluated Clemins's mental health treatment records at each stage in his decision. As he did in explaining his listing findings, the ALJ noted and carefully weighed conflicting evidence in assessing Clemins's RFC, rather than citing only the evidence that supported his decision. (R. 31–32.). Moreover, Clemins has not explained why the ALJ's failure to explain specific GAF scores warrants remand.

Clemins's two lowest GAF scores—30 on December 16, 2006, and 28 on April 15, 2011—coincide with his hospital admissions for suicidal ideations. GAF scores in the 21–30 range indicate "behavior … considerably influenced by delusions or hallucinations *or* serious impairment in communication or judgment (e.g. sometimes incoherent, acts grossly inappropriately, *suicidal preoccupation*) *or* inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)." *DSM-IV* 34 (emphasis added). It makes sense that Clemins's GAF score fell into this range when he was hospitalized for suicidal ideations. Because the ALJ noted and considered Clemins's hospital admissions and the reasons for them, he did not err in failing to separately mention these GAF scores. *Cf. Paris*, 2014 WL 534057, at *6 (finding that ALJ "sufficiently evaluated the record surrounding [claimant's] hospitalization" so that failure to specifically mention GAF scores assigned during hospitalization was not error).

Nor did the ALJ err in failing to specifically mention the GAF scores assigned by Sarah Coleman at Catawba Valley Behavioral Healthcare. The ALJ clearly considered Clemins's treatment records from these visits, citing them for facts both favorable and unfavorable to Clemins. (*Compare* R. 31 ("Records from Catawba Valley Behavioral health reveal continued depressive complaints with euthymic and dysphoric mood observed on numerous examinations,

as well as some anxious moods and social isolation."); *with* R. 32 (noting Clemins's statements to health care providers that his medications were working well).) *Cf. Love v. Astrue*, 3:11cv14-FDW-DSC, 2011 WL 4899989, at *5 (W.D.N.C. Sept. 6, 2011) (finding that ALJ committed no error in failing to mention individual GAF scores where ALJ "thoroughly evaluated the treatment records" during the relevant time period).

The ALJ's treatment of Clemins's GAF scores just before and after his April 2012 hospitalization presents a closer call. The ALJ incorrectly stated that Clemins's GAF score of 62 was assigned after his hospitalization in April 2011; this score was actually assigned three days before Clemins was admitted to AnMed Health. Doctors at AnMed Health assigned Clemins's a GAF of 45 on discharge (R. 1751), and David Stephenson at AOP assigned scores of 45 and 50 roughly a month and a half later. (R. 1823–24.)

Under the circumstances of this case, however, I am convinced that this error is harmless. The ALJ specifically cited the treatment notes surrounding Clemins's discharge from the hospital, which indicated that Clemins showed intact memory and good attention and concentration and denied suicidal ideation. (R. 28, 32, 1771.) Treatment notes from Clemins's April 2011 hospital stay demonstrate consistent improvement. (R. 1751, 1769, 1771.) Likewise, the discharge summary described Clemins as "stable" and "showing some improvement in his depression and willingness to continue outpatient treatment." (R. 1751.) Similarly, the ALJ also specifically cited the treatment notes from Clemins's visit to AOP in June 2011, where Stevenson assigned him GAF scores of 45 and 50. (R. 28, 31, 1819–24.) In fact, the ALJ relied in part on this evidence in giving only "some" weight to the opinions of Coates and Dr. Reavis. (R. 33.) Finally, Clemins does not dispute the underlying point the ALJ was making in citing the

GAF of 62—that Clemins's "conditions had remained rather constant since" the prior ALJ decision of September 9, 2009. (R. 34.)

Clemins accuses the ALJ of "cherry-picking" his high GAF scores and ignoring his low ones. (Pl. Br. 7.) When an ALJ cites only a claimant's high GAF scores but fails to mention lower ones, this may be an indication that the ALJ has relied on evidence that a claimant is not disabled while ignoring evidence that a claimant is disabled. *See Colon v. Barnhart*, 424 F. Supp. 2d 805, 813–14 (E.D. Pa. 2006). However, the mere fact that the ALJ cited a higher GAF score, but failed to cite lower ones does not by itself warrant reversal. *See Rios v. Commissioner*, 444 Fed. Appx. 532, 535 (3d Cir. 2011) ("We agree with the District Court that the ALJ's omission of the psychiatrists' GAF scores does not warrant remand. The ALJ was not "cherry-picking" or ignoring medical assessments that ran counter to her finding."). The ALJ did not place significant reliance on any of the GAF scores in this case. He cited the score of 62 solely in support of his conclusion that Clemins's condition had not significantly changed since the last ALJ decision. The ALJ's decision overall demonstrates that he did not "cherry pick" evidence supporting his decision, but instead thoroughly considered evidence both favorable and unfavorable to Clemins.

Finally, Clemins has not shown how the ALJ's failure to discuss his GAF scores caused him any prejudice. He fails to identify any additional functional limitations the ALJ should have included in his RFC assessment on account of his GAF scores.

Because the ALJ thoroughly considered and evaluated Clemins's mental health treatment records, remand for discussion of Clemins's GAF scores is unwarranted.

B.  *The ALJ's Pain Standard Analysis*

Clemins argues that the ALJ misapplied the pain standard in two respects. First, he argues that the ALJ erred in failing to find that his spinal arthritis was "a severe impairment which is

reasonably likely to cause the type of pain symptoms" Clemins claims he suffered. (Pl. Br. 8.)
Second, he argues that the ALJ erred in finding him not fully credible based solely on the lack of
objective evidence. (Pl. Br. 9–10.)

### 1. The Pain Standard

When a claimant alleges he is disabled due to symptoms like pain or fatigue, regulations
require the ALJ to follow a two-step process in evaluating subjective symptoms and determining
the extent to which they limit the claimant's capacity to work. 20 C.F.R. §§ 404.1529, 416.969;
*Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether
objective medical evidence shows "'the existence of a medical impairment which results from
anatomical, physiological, or psychological abnormalities which could reasonably be expected to
produce the pain or other symptoms alleged.'" *Craig*, 76 F.3d at 594 (quoting 20 C.F.R.
§ 416.929(b)). To clear this threshold, the claimant must show "by objective evidence of the
existence of a medical impairment 'which could reasonably be expected to produce' the actual
pain [or other symptom], in the amount and degree, alleged by the claimant." *Id.*

If the claimant has made this step one showing, the ALJ must proceed to the second step
and evaluate the intensity and persistence of a claimant's subjective symptoms, taking into
account the claimant's statements along with "all the available evidence, including the claimant's
medical history, medical signs, and laboratory findings; any objective medical evidence of pain
(such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.);
and any other evidence relevant to the severity of the impairment, such as the claimant's daily
activities, specific descriptions of the pain, and any medical treatment taken to alleviate it." *Id.*;
20 C.F.R. §§ 404.1529(c), 416.929(c). If the objective medical evidence by itself supports the
claimant's allegations about the intensity and persistence of subjective symptoms, the ALJ must
accept those allegations as true. Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *1.

However, if the claimant's "statements about pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must … make a finding on the credibility of the [claimant's] statements about symptoms and their functional effects." *Id.* at *4.

Once the claimant has shown the existence of an impairment that could reasonably be expected to produce the alleged pain or other symptoms, the ALJ may not dismiss a claimant's testimony regarding the intensity and persistence of those symptoms "solely because the available objective medical evidence does not substantiate" those statements. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *Hines v. Barnhart*, 453 F.3d 559, 563–64 (4th Cir. 2006); *Craig*, 76 F.3d at 595. Thus, on the second step, subjective evidence alone may suffice to establish that pain or other symptom is disabling. *Hines*, 564 F.3d at 564–65. However, a claimant's "symptoms, including pain, will be determined to diminish [his or her] capacity for basic work activities … to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

Provided he stays within these bounds, "[i]t is the province of the ALJ to assess the credibility of … a claimant." *Ratliff v. Barnhart*, 580 F. Supp. 2d 504, 517 (W.D. Va. 2006). The ALJ must articulate "specific reasons for the [credibility finding]," and these reasons must be "supported by the evidence in the case record." SSR 96-7p, 1996 WL 374186, at *2. The ALJ's reasons "must be sufficiently specific to make clear" to the claimant and the reviewing court how the ALJ weighed the statements and why. *Id.* at *4; *Dunn v. Colvin*, 973 F. Supp. 2d 630, 639 (W.D. Va. 2013). So long as the ALJ has followed the regulations, the reviewing court must defer to the ALJ's determination if it is reasonable. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (citing *Craig*, 76 F.3d at 589); *see also Dunn*, 973 F. Supp. 2d at 640

("[T]he question for the Court is whether the ALJ applied the proper legal standard in assessing Plaintiff's credibility, and whether the ALJ's decision is supported by substantial evidence.").

    *2. Arthritis*

    Clemins argues that the ALJ erred in failing to consider the effects of his arthritis in applying the pain standard. Clemins points to two lumbar spine MRIs: one from December 2006 that indicated disc bulge between the fifth lumbar and first sacral vertebrae and one from October 28, 2008, that demonstrated bilateral facet disease, a form of osteoarthritis, between the fourth and fifth lumbar vertebrae as well as bilateral facet degeneration between the fifth lumbar and first sacral vertebrae. (Pl. Br. 4; R. 882, 1228.) Clemins also notes extensive medical records from Caldwell Memorial Hospital indicating a diagnosis of lumbar facet arthropathy, which is also a form of arthritis. (R. 889–902, 1405–1676.) Finally, Clemins points to a letter from Dr. Walker in which Dr. Walker states that Clemins "has severe arthritis." (R. 1825.) Clemins argues that this evidence "establishes the existence of a severe impairment which is reasonably likely to cause the type of pain symptoms" Clemins claims he suffered. (Pl. Br. 8.)

    A review of the record shows that the ALJ thoroughly considered the evidence relevant to Clemins's back problems, which the ALJ found severe at step two and recognized was Clemins's "most substantial physical impairment." (R. 22, 25, 34.) The ALJ considered Clemins's back problems at length in assessing Clemins's residual functional capacity. (R. 30–31.) In accordance with the pain standard, the ALJ found that Clemins's "medically determinable impairments," aside from black out spells and fibromyalgia, "could reasonably be expected to cause the alleged symptoms," but that Clemins was not fully credible as to the intensity, persistence, and limiting effects of those symptoms. (R. 30.) Still, the ALJ explained that Clemins's back problems and obesity led him to limit Clemins "to light work exertionally with the option to alternate between

sitting and standing with substantial postural restrictions." (R. 30.) After summarizing the

medical records and other evidence regarding Clemins's back problems,[17] the ALJ continued:

> Specifically, though [Clemins] has alleged disabling back pain, and testified he experienced no improvement with medication and injections, this is directly contradicted by multiple reports in medical records. Numerous treatment notes report "very good" relief with injections, repeated treatment notes report [Clemins] was doing "very well" with his medication or experienced improvement therewith, and [Clemins] reported prescribed Flexeril was "doing well" for his pain in April 2011. Moreover, [Clemins] reported "very good relief" with facet joint denervation, and was "extremely satisfied" with his pain control in December 2008.

(R. 31.)

The ALJ considered Clemins's alleged impairment of arthritis separately from his

discussion of Clemins's back problems. At step two, the ALJ found Clemins's arthritis

nonsevere, reasoning that "the record reveals no diagnostic imaging of the extremities showing

arthritic changes, treatment records reveal no significant specific treatment for arthritis, the basis

for Dr. Walker's [contrary] assessment is unclear, and extremity examinations revealed no

extremity edema, normal strength, and full ranges of motion." (R. 26.) At step four, the ALJ

declined to assign any functional limitation based on arthritis. (R. 32.)

This discussion suggests that the ALJ failed to recognize that Clemins's back problems

were, at least in part, arthritic. The ALJ's confusion on this point is evident in his consideration

of the opinion of Dr. William Walker. Dr. Walker wrote a letter dated July 26, 2011, stating his

opinion that Clemins was disabled. (R. 1825–26.) In the letter, Dr. Walker indicates that Clemins

"has severe arthritis," "scoliosis," and "lumbar disc [sic]." (R. 1825.) He notes that Clemins "has

difficulty walking, difficulty ambulating," that he uses a cane, and that "[h]e falls frequently."

(R. 1825–26.) Dr. Walker concludes that "Mr. Clemmons [sic] has severe COPD, obstructive

---

[17] The Court examines the ALJ's findings regarding Clemins's back problems in greater detail in Section IV.B.3 of this Report and Recommendation.

sleep apnea, severe arthritis, anxiety/depression. It is my feeling that he is not able to do any job that requires significant bending, lifting, or sitting." (R. 1826.)

The ALJ gave little weight to Dr. Walker's letter. (R. 33.) The ALJ explained that "Dr. Walker premised [his] assessment [that Clemins was disabled] in part on 'severe arthritis,'" but noted that "Dr. Walker's report contains no abnormal objective findings regarding arthritis, and the balance of the medical evidence is likewise bereft of abnormal, objective arthritic findings." (R. 33.) After pointing out several inconsistencies between statements in Dr. Walker's letter and other medical evidence of record, the ALJ added, "Dr. Walker did not even premise the physical limitations he assessed on [Clemins's] back problems, which [Clemins's] treatment history indicates are [his] most substantial physical impairment." (R. 34.)

It appears, however, that Dr. Walker intended to refer to Clemins's back problems when discussing his "arthritis." Dr. Walker initially notes "arthritis" immediately before he mentions "scoliosis" and "lumbar disc." (R. 1825.) And, in the last paragraph of his letter, he notes Clemins's "severe arthritis" immediately before opining that Clemins "is not able to do any job that requires significant bending, lifting, or sitting." (R. 1826.) These are limitations one would expect to result from back problems, not arthritis of the hands or feet.

However, the ALJ's confusion in this case does not warrant reversal because any error was harmless. The ALJ found that Clemins had a severe impairment of "disorders of the spine," a category that encompasses arthritic as well as other spinal conditions. Applying the pain standard, the ALJ found that this impairment "could reasonably be expected to cause" Clemins's pain and thoroughly considered Clemins's back problems in evaluating Clemins's credibility. In disability cases, "the focus of the analysis is on the functional limitations caused by the impairment, not the label attached to [it]." *Anderson v. Colvin*, 514 Fed. Appx. 756, 761 (10th

Cir. 2013) (citing *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988)); *see also Fountain v. Astrue*, Civ. No. CBD-11-1884, 2013 WL 145873, at *5 (D. Md. Jan. 11, 2013) ("Plaintiff has not provided any evidence to suggest that his cirrhosis causes him functional and work-related limitations distinct from those caused by his hepatitis C. Given the ALJ's thorough assessment of the limitations caused by Plaintiff's chronic liver disease, her failure to identify cirrhosis as a separate severe impairment from hepatitis C did not prejudice Plaintiff and does not warrant remand."). Thus, remand is not warranted here simply because the ALJ failed to identify arthritis as a separate severe impairment or determine that it "is reasonably likely to cause" the sort of pain Clemins alleged.

### 3. Credibility

Clemins argues that the ALJ erred in assessing his credibility by "ignor[ing] the medical evidence that lends credibility to [his] allegations of pain" and by improperly relying on the lack of objective medical evidence. (R. 9)

As noted above, the ALJ found that Clemins's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the ALJ's RFC assessment]." (R. 30.) Over the following three pages of his opinion, the ALJ evaluated Clemins's statements regarding particular symptoms and assessed the credibility of each of those statements. (R. 30–32.) A full page of the ALJ's discussion relates to Clemins's complaints of back pain. (R. 30–31.) First, the ALJ found that Clemins's obesity and back pain limited him to light work with a sit-stand option and "substantial postural restrictions." (R. 30.) The ALJ then reviewed the medical evidence he relied on in reaching this conclusion:

> MRI of claimant's lumbar spine in October 2008 revealed L4-S1 disc desiccation with mild foraminal encroachment at L5-S1 (Exhibit B3F/10), treatment records reveal some complaints of lower extremity pain (Exhibit B10F), and Zizette Gabriel, MD, reported claimant was "morbidly obese" (Exhibit B10F/54). In addition, examination in December 2006 revealed mildly decreased

flexion (Exhibit B2F/5), claimant has a history of consistent treatment for back pain (Exhibit B10F), straight leg raising test in August 2008 was positive (Exhibit B10F/200), claimant was advised to lose weight to improve his back pain (Exhibit B10F/112), and a number of examinations revealed back tenderness (Exhibit B10F). However, lumbar x-ray in December 2006 was normal other than some mild retrolisthesis (Exhibit B2F/11), normal gait was repeatedly observed by sources at Catawba Valley Behavioral Health (Exhibit B9F/18, 23, 27, 32, and 38), examination in December 2006 showed full lateral bending and normal heel and toe walking (Exhibit B2F/4), examination in August 2008 demonstrated lumbar motion within the normal range (Exhibit B10F/200), Felicia Cain, MD, reported she did "not really see any signs of neurologic compromise" in November 2008 (Exhibit B10F/164), and treatment notes report no side effects from medication (Exhibit B10F). In addition, examinations in February and April 2009 demonstrated no back tenderness (Exhibit B4F/1 and 6), claimant denied radiation of pain into his legs in May and September 2009 (Exhibit B10F/74 and 112), Ms. Coates observed claimant used a cane but had no limp and walked at a good pace (Exhibit B11F/1), Ms. Coates observed claimant had no difficulty standing from a seated position and sat comfortably throughout the evaluation (Exhibit B11F/1), steady gait was observed in July 2010 (Exhibit B12F/2), examination in October 2010 revealed full back ranges of motion without tenderness, ability to walk on heels and toes, and negative straight leg raising (Exhibit B 16F/2, 3, and 20), MRI of claimant's lumbar spine in November 2010 demonstrated "minimal" disc bulging at L4-L5 with patent neural foramen (Exhibit B17F), physical examinations showed normal strength, sensation, and reflexes (Exhibit B10F/123 and 200; Exhibit B5F/6, 7,15, and 26; Exhibit B8F/2 and 12; Exhibit B16F/2 and 3; Exhibit B20F/6), examination in October 2010 revealed normal back ranges of motion (Exhibit B16F/2), claimant stated in a Function Report that he drove, could go out alone, and shopped (Exhibit B6E), Kevin Morton, FNP, observed claimant "stood up out of chair rapidly when asked for assessment and pulled his t-shirt off without … pain[,]" (Exhibit B16F/2), and claimant sat without difficulty throughout the hearing.

(R. 30–31.)

Next, the ALJ noted that treatment notes contradicted Clemins's claim that his back pain was disabling and that medication or injections provided no relief. (R. 31.) Specifically, the ALJ cited treatment notes reporting that Clemins received "very good" relief from injections and that he was "doing well" or experienced improvements with medication. (R. 31, 1425, 1438, 1447, 1468, 1478, 1508, 1533, 1551, 1575, 1585.) The ALJ also noted that "[Clemins] reported 'very good relief' with facet joint denervation, and was 'extremely satisfied' with his pain control in December 2008." (R. 31, 1559.)

After discussing Clemins's credibility regarding his other complaints, the ALJ addressed evidence that led him to question Clemins's credibility more generally:

> Additional evidence weighs against the credibility of claimant's allegations and supports my residual functional capacity finding. Though claimant has alleged he has been unable to work since August 2006, claimant reported he quit working in August 2006 due to problems with a supervisor (Exhibit B11F/2). Such suggests claimant's back problems did not prevent him from working. I note claimant testified this job was "very heavy," and involved lifting 30 pounds consistently and standing for 8 hours a day, and reported earlier that it involved lifting 50 pounds frequently (Exhibit B5E). Next, though claimant presented to AnMed Health in October 2010 with complaints of back pain, examination showed full back ranges of motion without tenderness and Kevin Morton, FNP, observed claimant "stood up out of chair rapidly when asked for assessment and pulled his t-shirt off without … pain" (Exhibit B16F/2). This suggests possible exaggeration. Furthermore, results of pulmonary function testing in March 2011 were considered "questionable" due to "poor performance" by claimant (Exhibit B19F/5). This further suggests possible exaggeration. Moreover, Ms. Coates and Dr. Reavis report claimant was "by no means … as depressed as []he seems to think that he is" (Exhibit B11F/5). Again, this suggests claimant is lacking in reliability.

> No one inconsistency or conflict described above is dispositive. However, viewed as whole, the identified evidence sufficiently demonstrates that claimant's allegations lack credibility.

(R. 32–33.)

While Clemins is correct to point out that an ALJ may not discredit a claimant's testimony about subjective symptoms merely because that testimony is unsupported by objective evidence (Pl. Br. 9), that is not what the ALJ did in this case. The ALJ here considered not only the objective medical evidence regarding Clemins's back problems, but also Clemins's own statements about the relief he obtained from treatment, Clemins's reports of his daily activities, and Clemins's tendency to exaggerate the severity of his symptoms in general. The ALJ thus provided "specific reasons … supported by the case record" for finding Clemins less than fully credible. SSR 96-7p, 1996 WL 374186, at *2.

Similarly, there is no basis for Clemins's assertion that the ALJ "in essence … ignored the medical evidence" supporting Clemins's allegations. The ALJ cited evidence supporting and opposing Clemins's allegations and based on that evidence found Clemins partially credible. And although the ALJ did not credit all of Clemins's testimony, he limited Clemins to light work with a sit-stand option and only occasional stooping, crouching, or climbing because of Clemins's back problems. (R. 29–30.)

Because the ALJ's determination that Clemins was less than fully credible was neither unreasonable nor the product of legal error, the Court may not disturb it on review. *Johnson*, 434 F.3d at 653; *Dunn*, 973 F. Supp. 2d at 638. Furthermore, the ALJ properly applied the pain standard in determining that Clemins's back pain, while substantially limiting, was not disabling, and his conclusion is supported by substantial evidence in the record.

V.      Vocational Expert

Clemins's final assignment of error faults the ALJ for giving little weight to the opinion of Benson Hecker, Ph.D., a vocational expert hired by Clemins. (Pl. Br. 10–11.) After reviewing the records in this case and interviewing Clemins, Dr. Hecker submitted a report containing his findings. (R. 1827–47.) In the report, Dr. Hecker summarized the medical exhibits, Clemins's educational and work history, and his interview with Clemins. (R. 1827–44.) Dr. Hecker concluded that, "[b]ased on Mr. Clemins' age, education, vocational opinion, transferable skills, his impairments, limitations, and his continuing chronic moderately-severe pain, it is my opinion that Calvin E. Clemins is unable to perform any substantial gainful activity which exists in significant numbers in open competition with others." (R. 1844.)

Dr. Hecker offered several reasons for reaching this conclusion. He noted Clemins's "long history of treatment for physical and emotional problems." (R. 1844.) He found that Clemins "is limited in his capacities for reaching, lifting, carrying, sitting, standing, walking,

bending, stooping, squatting, turning, and twisting," and that his pain often requires him to stop

what he is doing to change positions, take medications, lay down, or seek heat therapy. (*Id.*)

Turning to Clemins's psychological condition, Dr. Hecker noted Clemins's diagnoses and GAF

scores, as well as the limitations indicated in a psychiatric review technique and mental RFC

assessment contained earlier in the record. (R. 1845.) Dr. Hecker concluded:

> Vocationally translated, any unskilled work at "light and/or sedentary" levels of physical exertion would require capacities for sitting, standing walking, maintaining attention or concentration for prolonged periods of time. Additionally, Mr. Clemins would be required to use his upper and/or lower extremities rapidly, repetitively, and continuously while operating machinery or while using tools in order to meet "production" quotas or standards. Finally, Mr. Clemins would be required to maintain work station/attendance regularly (five days weekly/eight hours daily), be able to effectively deal with 'normal' work stresses associated with meeting "production" quotas, and be able to effectively get along with significant others (co-workers/supervisors/general public).

> Given Mr. Clemins's age, education, vocational background and transferable skills, his impairments (physical/psychological), the limitations that those impairments impose upon him as well as his chronic moderately-severe to severe pain, it is my opinion that Mr. Clemins is unable to effectively perform "basic" work related job functions on a regular and continuing basis. As a result, it is my opinion that Mr. Clemins is unable to perform any substantial gainful work activity which exists in significant numbers in open competition with others.

(R. 1846.)

The ALJ considered Dr. Hecker's opinion in his assessment of Clemins's residual

functional capacity, but gave it "little weight." (R. 34.) The ALJ explained his reasoning as

follows:

> "Dr. Hecker is a vocational expert, not a medical expert, and while such an expert's opinion is useful in determining whether an individual with a given set of limitations can do certain jobs, such is not particularly pertinent for evaluating an individual's medical conditions. Moreover, Dr. Hecker concluded that, given the "limitations that [Clemins's] impairments impose," [Clemins] would not work on a regular and continuing basis. However, it is not clear to what "limitations" Dr. Hecker was referring. In addition, a number of the conditions Dr. Hecker reported are not severe impairments for the reasons described [earlier in the ALJ's decision]."

(R. 34.)

Here, the ALJ's decision to reject Dr. Hecker's opinion was entirely reasonable, and his explanation for doing so was supported by substantial evidence. Dr. Hecker has a Ph.D., in an unspecified field, and he was not presented as an "acceptable medical source" capable of rendering a "medical opinion" entitled to any special weight in the ALJ's RFC assessment. 20 C.F.R. §§ 404.1513(a), 404.1527, 416.913(a), 416.927; *see also Bullington v. Astrue*, No. 2:08-cv-122, 2009 WL 2579627, at *13 (E.D. Tenn. Aug. 17, 2009) ("[A] vocational expert is not a medical doctor and cannot make medical judgments." (citing *Maziarz v. Secretary of Health and Human Services*, 837 F.2d 240, 247 (6th Cir. 1987); *Cook v. Heckler*, 739 F.2d 396, 399 (8th Cir. 1984))). Clemins does not argue otherwise; instead, he insists that Dr. Hecker "did not attempt to reach any medical opinions but based his vocational opinions on the medical opinions reached by medical experts." (Pl. Br. 11.) Clemins is simply wrong on this point. Dr. Hecker's statement that "Clemins is unable to perform any substantial gainful work activity which exists in significant numbers" reflects his lay judgment about Clemins's capacity and limitations and not just his expert opinion about the availability of work for someone with a given capacity, limitations, and vocational profile. Moreover, the ALJ considered the medical opinions upon which Dr. Hecker purports to rely and found that they were entitled to little weight. As explained above, substantial evidence supports the ALJ's RFC assessment. *See supra* part IV. The fact that Dr. Hecker reached a different conclusion about Clemins's limitations does not undermine the ALJ's RFC assessment. Accordingly, the ALJ did not err in rejecting Dr. Hecker's opinion.[18]

---

[18] Other courts confronted with similar opinions from Dr. Hecker have largely reached the same result. *Josselyn v. Chater*, 69 F.3d 533, at *2 (4th Cir. Oct. 25, 1995) (unpublished per curiam opinion); *West v. Astrue*, No. 4:10-cv-2712-MBS, 2012 WL 988113, at *11 (D.S.C. Mar. 21, 2012) (Dr. Hecker's opinion submitted to the Appeals Council did not warrant remand because

## VI. Conclusion

Certainly the ALJ made some errors in his decision, but he also applied the correct legal standard, provided a comprehensive analysis of the evidence, and explained his findings. Because I find that the ALJ's determinations are supported by substantial evidence, *see Hall v. Colvin*, No. 7:12-cv-327, 2014 WL 988750, at *8 (W.D. Va. Mar. 13, 2014) ("procedural perfection in administrative proceedings is not required") (citations and quotations omitted), I respectfully recommend that Clemins's motion for summary judgment (ECF No. 15) be DENIED, the Commissioner's motion for summary judgment (ECF No. 17) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

---

"the ALJ's first hypothetical question accurately reflected the residual functional capacity Plaintiff was found to have"); *Smith v. Astrue*, No. 3:08-cv-1674-DCN-JRM, 2008 WL 4414297, at *9 n. 4 (D.S.C. Sept. 23, 2008) ("Although Dr. Hecker concluded that Plaintiff had functional limitations that precluded him from working, Dr. Hecker is a vocational expert and not a physician. … A vocational expert's role in the disability determination process is limited to determining the vocational effect of the limitations found by the ALJ."); *Blanton v. Astrue*, No. 9:07-CV-0380-DCN, 2008 WL 793601 at *16 (D.S.C. Mar. 25, 2008) (finding post-hearing opinion from Dr. Hecker did not warrant remand because the hypothetical on which his opinion was based "contained limitations that the ALJ ultimately found were not supported by the record," and as such, "the ALJ would not have been required to accept Dr. Hecker's [opinion]"). Compare *Cercopoly v. Astrue*, C/A No. 4:11-02186-TER, 2013WL 655954 (D.S.C. Feb. 22, 2013), where the district court remanded for the ALJ to consider Dr. Hecker's opinion that "the jobs cited by the VE at the hearing could not be performed with the visual limitations in the ALJ's RFC findings." *Id.* at *2.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: June 26, 2014

Joel C. Hoppe
United States Magistrate Judge